**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR SEARCH WARRANTS**

I, Edwin Woo, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Detective with the Braintree Police Department, where I have been employed since 2013. Since 2019, I have been assigned to the Financial Investigations Team of the New England Field Division of the Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO"). I am a graduate of the MBTA Transit Police Academy.

3. As a Braintree Police Detective and a DEA TFO, I am authorized to investigate violations of the law of the United States, including violations of federal drug and money laundering offenses. I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through

my training and experience, I have become familiar with the manners in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF THE AFFIDAVIT

6. I submit this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41 for the following cellular devices seized from Jean Pierre CASTRO-NOVOA at the time of his arrest on May 26, 2021 (hereinafter, the "Target Telephones"):

   a. A white iPhone containing no identification numbers ("Target Telephone #1"). Target Telephone #1 is further described in Attachment A; and

   b. A gray iPhone containing no identification numbers ("Target Telephone #2"). Target Phone #2 is further described in Attachment A.

7. I submit this affidavit in furtherance of an ongoing criminal investigation into Jean Pierre CASTRO-NOVOA and others concerning violations of federal law, including 21 U.S.C. §§841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846

(conspiracy to distribute and to possess with intent to distribute a controlled substance) and 18 U.S.C. §1956(h) (conspiracy to launder money) (hereinafter, the "Target Offenses").

8.      Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that the requested information, as described in Attachment B, will constitute or lead to evidence of the Target Offenses, as well as the identification of individuals who are engaged in the commission of the Target Offenses.

9.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause to believe that evidence of the Target Offenses, described more fully in Attachment B, exists in the Target Telephones, described more fully in Attachment A. All times set forth herein are approximate.

## PROCEDURAL HISTORY

10.     On May 20, 2021, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the collection of location data for a cellular phone used by CASTRO-NOVOA bearing phone number (203) 503-7590 (hereinafter, the "7590 Number"). The affidavit submitted in support of the May 20 warrant is incorporated herein by reference (the "May 20 Affidavit").

11.     On May 27, 2021, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, issued a criminal complaint charging CASTRO-NOVOA with distribution of and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §841. The affidavit submitted in support of the May 27 criminal complaint is incorporated herein by reference (the "May 27 Affidavit").

12. On May 27, 2021, a Boston federal grand jury returned a four count indictment charging CASTRO-NOVOA with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §846 (Count One); distribution of and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §841 (Counts Two and Three); and conspiracy to launder money, in violation of 18 U.S.C. §1956(h) (Count Four).

## PROBABLE CAUSE
### *Summary of Investigation*

13. From March 2019 through May 26, 2021, investigators with DEA gathered evidence on target subjects as part of an undercover investigation into a money laundering organization ("MLO") that collects drug proceeds from locations throughout the world and then launders those funds on behalf of drug trafficking organizations ("DTOs"). As part of this investigation, undercover agents ("UCs") have posed as money launderers who were willing and able to collect drug proceeds and then launder those proceeds for the DTOs. Through the investigation, investigators learned that CASTRO-NOVOA, based in the United States, was coordinating money pickups of drug proceeds in a number of countries, including New Zealand, Australia, Italy, Ireland, and the United States, and facilitating the laundering of those proceeds on behalf of DTOs.

14. Throughout this investigation, CASTRO-NOVOA used multiple phone numbers to regularly communicate with a UC via phone calls, text messages, and WhatsApp messages[1] for the purpose of arranging money pickups in countries throughout the world and drug transactions

---

[1] WhatsApp is a mobile cellular application that allows users to place calls and send encrypted text messages to other subscribers.

in Massachusetts. As detailed herein, the investigation led to seizures of kilogram quantities of cocaine, the arrest of CASTRO-NOVOA, and the identification of some of his associates.

CASTRO-NOVOA coordinated two money pickups in New Zealand.

15. In March 2019, a UC ("UC-1") accepted a contract to pick up and launder $700,000[2] in New Zealand dollars ("NZD"). The contract had been placed by a Colombia-based money broker. UC-1 was given a serial number for a dollar bill and the number for a New Zealand-based phone (226 320 8111) to call to coordinate the pickup. UC-1 called the New Zealand number and spoke with a male later identified as CASTRO-NOVOA. CASTRO-NOVOA exchanged the serial number with UC-1 as confirmation of the pickup and coordinated with UC-1 a time and location for the money pickup to occur. On March 28, 2019, CASTRO-NOVOA delivered $200,250 NZD (which converted to $134,586 in U.S. currency) to a New Zealand UC. After the money pickup occurred in New Zealand, investigators wired the money to various accounts that had been provided by the MLO for which CASTRO-NOVOA worked. After this meeting, CASTRO-NOVOA and UC-1 kept in contact by phone, using the mobile application WhatsApp.

16. In July 2020, CASTRO-NOVOA used phone number (917) 275-2834 ("the 2384 Number") to send UC-1 a WhatsApp message notifying him about another large money pickup in New Zealand. UC-1 and CASTRO-NOVOA had numerous conversations to coordinate the money exchange. In August 2020, one of CASTRO-NOVOA's associates delivered $150,090 in NZD (which converted to $92,920 in U.S. currency) to a UC in New Zealand. After the pickup, UC-1 met CASTRO-NOVOA in Connecticut and gave CASTRO-NOVOA $85,500 in U.S. currency, which was the converted rate minus UC-1's commission for laundering the funds. During that

---

[2] The amount ultimately changed to $200,250 New Zealand dollars, which converted to $134,586 in United States currency.

meeting, CASTRO-NOVOA told UC-1 that the associate who delivered the $150,090 to the UC in New Zealand worked for him selling methamphetamine in Australia, which they obtained from Thailand. CASTRO-NOVOA asked if UC-1 was able to pay out money in Mexico, noting that he would need to pay money in Culiacan in the future. CASTRO-NOVOA also talked to UC-1 about UC-1's interest in purchasing cocaine.

17. Since 2019, UC-1 has had numerous phone contacts with CASTRO-NOVO during which UC-1 learned that CASTRO-NOVOA was also trafficking drugs, specifically cocaine (which he referred to using the code word "pepe").[3] CASTRO-NOVOA indicated that he could supply UC-1 with kilogram quantities of cocaine. All of the calls and text message communications have been recorded and preserved. As detailed below, CASTRO-NOVOA and UC-1 used the code words "cars" or "vehicles" to refer to the kilograms of cocaine.

<u>March 2021: CASTRO-NOVOA delivered cocaine to an undercover officer.</u>

18. On March 15, 2021, CASTRO-NOVOA used the 7590 Number to send a message to UC-1 over WhatsApp. Using coded language, CASTRO-NOVOA told UC-1 that he had an associate located in New London, Connecticut who was doing well selling cocaine, but that the prices for cocaine were high. UC-1 asked the price for a kilogram of cocaine ("white cars") and CASTRO-NOVOA replied the kilograms were $39,000 a piece ("39"). UC-1 told CASTRO-NOVOA that he had a customer who wanted to purchase kilograms of cocaine ("cars") and asked if CASTRO-NOVOA's supplier could reduce the price. CASTRO-NOVOA said he believed the price was negotiable if the customer purchased a "couple" (of kilograms). UC-1 said his customer wanted to purchase "five" (meaning five kilograms) but that UC-1 told the customer to start with

---

[3] My interpretations of the coded language used in the described conversations and communications is based on my training and experience and knowledge of the investigation.

"one or two" at first to see if the quality of the cocaine ("cars") was good. CASTRO-NOVOA said he would personally deliver the cocaine to UC-1's customer.

19.     During subsequent phone communications, UC-1 told CASTRO-NOVOA that his customer wanted to purchase a half kilogram of cocaine to start and agreed to pay $19,500 for the half kilogram.  On March 23, 2021, UC-1 sent a message to CASTRO-NOVOA (using the 7590 Number) to set up the drug transaction the following day at a location in Framingham, Massachusetts. On March 24, 2021, UC-1 sent the location information to CASTRO-NOVOA and reported that the customer could meet CASTRO-NOVOA at 1:00 p.m. At 12:48 p.m., CASTRO-NOVOA sent UC-1 a message indicating he was at the meeting location. Shortly after 1:00 p.m., UC-1 arrived at the meeting location in Framingham. CASTRO-NOVOA got out of a black Mercedes Benz carrying a black satchel bag, walked towards UC-1's vehicle, and got into the vehicle. An unidentified Hispanic male remained in the Mercedes. When asked, CASTRO-NOVOA told UC-1 that the Hispanic male was with him. UC-1 asked if the Hispanic male had the "thing" (meaning, the half kilogram of cocaine), and CASTRO-NOVOA replied that the cocaine was in his satchel bag. CASTRO-NOVOA opened the satchel bag and pulled out a clear Ziploc bag containing a large piece of an off-white substance wrapped in clear plastic. UC-1 asked if the quality of the cocaine was good and if it had been "mixed" with anything else. CASTRO-NOVOA assured UC-1 the quality was fine and that the customer could "cook it" (meaning, into crack cocaine) if he wanted to do so.

20.     UC-1 then called a second UC ("UC-2"), who was posing as the customer who was purchasing the cocaine. UC-2, accompanied by a third UC ("UC-3"), got into UC-1's car with UC-1 and CASTRO-NOVOA. CASTRO-NOVOA handed UC-2 the Ziplock bag containing the

suspected cocaine,[4] and in return, UC-2 handed CASTRO-NOVOA an envelope containing $19,500. CASTRO-NOVOA asked UC-2 how much was in the envelope, and UC-2 replied, "Nineteen five."

21.    CASTRO-NOVOA told UC-2 that his associates were "active" and were local. CASTRO-NOVOA told UC-2 to call UC-1 if he (UC-2) was interested in purchasing larger quantities. UC-2 told CASTRO-NOVOA he wanted to purchase between five and ten kilograms every two weeks but would need time to pay. CASTRO-NOVOA replied that the total amount had to be paid at the time of delivery. UC-2 asked CASTRO-NOVOA if he could purchase "five" (kilograms) and pay for "four" upfront. UC-1 vouched for UC-2 and agreed to be responsible for the remaining payment if UC-2 failed to pay. CASTRO-NOVOA agreed, and again told UC-2 to contact UC-1 when he was ready to purchase the additional kilograms. CASTRO-NOVOA said his supplier did not have the five kilograms on hand at that time, and he needed to coordinate with the supplier to secure the kilograms.

22.    After the March 24 controlled purchase of cocaine, UC-1 and CASTRO-NOVOA had several conversations via telephone to coordinate UC-1's purchase of additional kilograms of cocaine. On March 25, 2021, CASTRO-NOVOA used the 7590 Number to call UC-1. UC-1 told CASTRO-NOVOA that his customer (*i.e.,* UC-2) remained interested in purchasing more "vehicles" (meaning kilograms of cocaine). UC-1 told CASTRO-NOVOA he would be in touch when the customer was ready to make the additional purchase.

---

[4] The appearance of the substance was consistent with cocaine. Investigators conducted a field-test, which was positive for the presence of cocaine. The suspected cocaine was sent to the DEA laboratory for analysis, and those results are pending.

23.     On April 6, 2021, the UC-1 contacted CASTRO-NOVOA (who was using the 7590 Number) and told CASTRO-NOVOA that his purported customer (UC-2) was ready to buy five kilograms of cocaine. CASTRO-NOVOA said that he would talk to his supplier and get back to UC-1. Later, CASTRO-NOVOA told UC-1 that his supplier was going to Florida on vacation for two weeks, but that he could sell the UC-1 three kilograms before he left. UC-1 later informed CASTRO-NOVOA that his customer would wait until CASTRO-NOVOA's supplier returned and could supply the entire five kilograms.

24.     On May 18, 2021, UC-1 sent CASTRO-NOVOA a message informing him that his customer was ready to purchase some "vehicles." UC-1 told CASTRO-NOVOA his customer wanted to purchase "five" (meaning five kilograms of cocaine) and would pay for three of the kilograms upfront and then pay the balance for the remaining two kilograms two days later. UC-1 further stated that his customer wanted to purchase the cocaine on May 26, 2021. CASTRO-NOVOA acknowledged and said he would speak to his supplier and get back to UC-1 to arrange the purchase. The following day, CASTRO-NOVOA sent a message to UC-1 confirming he could deliver the five kilograms of cocaine to UC-1's customer on May 26, 2021. UC-1 replied that he would let the customer know.

MAY 2021: CASTRO-NOVOA delivered cocaine to an undercover agent.

25.     On May 26, 2021, CASTRO-NOVOA met UC-1 at a location in Framingham, Massachusetts. CASTRO-NOVOA got into UC-1's vehicle and showed him the contents of a box, which contained three brick shaped packages wrapped in black tape and a heat-sealed clear plastic bag, which contained a white powder substance. CASTRO-NOVOA told UC-1 that the box did not contain the full five kilograms that had been negotiated but explained he could supply UC-1 with five additional kilograms that coming Saturday. After the exchange, investigators arrested

CASTRO-NOVOA. The contents of the packages provided by CASTRO-NOVOA field tested positive for cocaine and had a gross weight of 4,562 grams. The suspected cocaine will be sent to the DEA laboratory for analysis.

26. At the time of CASTRO-NOVOA's arrest, he had the Target Telephones in his possession. Also, at the time of his arrest, the location data for the 7590 Number indicated it was in the area of the location of his arrest. Accordingly, I believe one of the Target Telephones is likely the 7590 Number.

### Location of the Equipment

27. The Target Telephones have been in the possession of investigators since the time they were seized.

### Probable Cause to Believe that the Target Telephones Contain Evidence and Instrumentalities of the Target Offenses

28. As discussed above, the investigation has demonstrated that CASTRO-NOVOA used three different phone numbers to participate in and facilitate the Target Offenses.

29. As discussed above, the Target Telephones are currently being stored by investigators. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that they have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the investigators' possession.

30. In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking. These tasks are frequently accomplished through text

messages, encrypted messages, and photographs. Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity. For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).  Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

31. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of computer "hardware") can now function essentially as small computers. The Target Telephones are smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Based on my training, experience, and information provided to

me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

32. Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media, in particular computers' internal hard drives, contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this

information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

33. Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B, are contained within the Target Telephones, described in Attachment A.

I, Edwin Woo, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

*Edwin Woo*

Edwin Woo, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 4th day of June 2021.

_____
Honorable Donald L. Cabell
United States Magistrate Judge

